[Crim. No. 211.   Third Appellate District.—August 18, 1913]

# THE PEOPLE, Respondent, v. NAT. LICHTENSTEIN et al., Appellants.

CRIMINAL LAW—POWER OF COURT ON APPEAL—QUESTIONS OF LAW.—On an appeal by the accused in a criminal case, the constitution (Art. VI, sec. 4) limits the power of the appellate court to the review of questions of law alone; questions of fact cannot be reviewed, unless they have developed a character which converts them into questions of law.

ID.—QUESTIONS OF FACT—WHETHER REVIEWABLE.—In criminal cases it is only where there is a clear failure of proof, or perhaps where the evidence is so slight as not to amount to satisfactory proof within the meaning of section 1835 of the Code of Civil Procedure, and the appellate court is legally justified in so declaring, or where the testimony from which the verdict must, if at all, derive its support, is inherently improbable, that the propriety of conviction on the evidence before the jury becomes a question of law within the competence of this court.

ID.—CONSPIRACY TO MANUFACTURE EVIDENCE ON WHICH TO OBTAIN DIVORCE.—The evidence in this case is sufficient to support a conviction of conspiracy to inveigle a married woman into a compromising position and thereby manufacture evidence upon which her husband might prosecute an action for divorce on the ground of adultery.

ID.—EVIDENCE—FINDINGS IN DIVORCE ACTION.—The findings in the divorce action in one department of the superior court that allegations of the conspiracy were not sustained by the evidence, cannot be considered by the appellate court in determining the sufficiency of the evidence to support a conviction of conspiracy in another department of the superior court.

ID.—EVIDENCE—ADMISSIONS BY ONE CONSPIRATOR.—Extra-judicial admissions, made by the conspirator who played the part of the wife's alleged paramour at the hotel where the other conspirators found them together, made the day following the episode and prior to the commencement of the action by her husband for a divorce, that he had been engaged in a scheme to entrap the wife of a friend, are admissible against all the conspirators.

ID.—LIMITATION OF ADMISSION TO CONSPIRATOR WHO MADE IT—INSTRUCTIONS.—If such evidence is admitted upon admonition to the jury that its application is to be limited to the defendant who made the admission, the other defendants cannot complain because the court

does not, in its final charge to the jury, restate the limitation, when they have made no request for such an instruction.

ID.—LIMITATION OF EVIDENCE TO SPECIFIC PURPOSE—REQUEST FOR INSTRUCTION TO THAT END.—Where testimony is properly received for a specific or limited purpose, and it is important that its consideration in reaching a conclusion upon the facts should be restricted to that purpose, it is the duty of counsel representing the side against which such testimony may be supposed to militate to ask for an instruction limiting the effect thereof to the particular purpose for which it was admitted.

ID.—JUDGES—CHANGE DURING TRIAL—JUDGE FROM ANOTHER COUNTY.— Where the judge trying a criminal case becomes sick and unable to proceed with the trial, section 1053 of the Penal Code authorizes a judge from another county to be substituted, on stipulation of the parties; the statute does not make it necessary to substitute another judge from the same county.

APPEAL from a judgment of the Superior Court of the City and County of San Francisco and from an order refusing a new trial. B. V. Sargent, Judge presiding.

The facts are stated in the opinion of the court.

George A. Knight, Harry E. Michael, and Knight & Heggerty, for Appellants.

U. S. Webb, Attorney-General, John H. Riordan, and J. Charles Jones, Deputy Attorney-General, for Respondent.

HART, J.—The defendants, having been jointly tried and convicted of the crime of conspiracy, as defined by section 182 of the Penal Code, under an indictment jointly charging them with that offense, have brought the cause to this court by an appeal from the judgment and the order denying them a new trial.

The assignments against the legality of the verdict are: 1. That the evidence is insufficient to justify the verdict; 2. Erroneous admission of certain testimony; 3. Errors in changing the trial judge during the trial of the cause and before it was completed.

The specific charge in the indictment is that the defendants conspired together for the purpose of manufacturing testimony upon which the defendant, Nat. Lichtenstein, might suc-

cessfully prosecute an action for divorce against his wife, Anita Feder Lichtenstein, on the ground of adultery with the defendant, Joseph, and, to consummate that purpose, and in pursuance of the said agreement and conspiracy between the defendants, the said Joseph, by artful and deceitful means, induced said Anita to accompany him to a hotel in said city and thence to a suite of rooms therein, which suite contained a bed; that, having inveigled said Anita into said room, said Joseph thereupon notified the other defendants that he (Joseph) and the said Anita could be found in said suite of rooms, and that, shortly after receiving the information so given them, the defendants, Nat. and Sam Lichtenstein and Milton Nathan repaired to said hotel and to said rooms and there found Joseph and Anita alone therein. The indictment then proceeds: "And in further pursuance of said conspiracy and to effect and consummate the object thereof, the said Nat. Lichtenstein and the said Milton Nathan, who was then and there an attorney at law, admitted to practice in all the courts of the state of California, and who was then and there the attorney for the said Nat. Lichtenstein, did, on the 30th day of December, 1911, cause a complaint to be filed in the superior court of the state of California, in and for the county of San Francisco, in a suit . . . for divorce, in which complaint the said Nat. Lichtenstein was named as plaintiff, the said Milton Nathan signed as attorney for plaintiff, and the said Anita Feder Lichtenstein was named as defendant, in which complaint it was alleged, among other things, that said defendant, Anita Feder Lichtenstein, did, on the 28th day of December, 1911, commit adultery with one B. Joseph at room 209 in the Bay State Hotel, number 275 O'Farrell Street, San Francisco, California, and in which complaint said plaintiff prayed, among other things, that the bonds of matrimony existing between himself and the said defendant be dissolved, and that all of the community property of said parties to said action be awarded to said plaintiff, the said Nat. Lichtenstein and the said Milton Nathan then and there well knowing that the said Anita Feder Lichtenstein had not committed adultery with the said H. I. Joseph, . . ., at room 209 in the Bay State Hotel, . . . on said 28th day of December, 1911, or at any time or at any place, or at all, and that the said allegations in respect of such adultery in said complaint for

divorce contained were then and there false and untrue, and the said Nat. Lichtenstein and the said Milton Nathan, on said 30th day of December, 1911, and at the time of signing and filing said complaint for divorce, well knew .that the said B. Joseph was and is one and the same person as said H. I. Joseph, sometimes, and in said complaint, called B. Joseph.''

1. It appears that Nat. Lichtenstein, one of the defendants, and Anita Lichtenstein, the complaining witness, intermarried, at the city of San Francisco, on the 2d day of March, 1905. Thereafter they moved to Salt Lake City, where the defendant, Nat., in association with his brothers, engaged in the jewelry business, continuing therein, at said city, for the period of approximately three years. It was in Salt Lake City that Anita first met the defendant, Joseph, then a resident of Denver, Colorado, he having been introduced to her by her husband at the residence of the latter's mother. Joseph's business was that of a traveling solicitor or ''drummer'' for a wholesale liquor house. He and the defendant, Nat. Lichtenstein, were intimate friends, and when in Salt Lake and otherwise not engaged, he invariably sought the companionship of Nat. and his family, often going to the store of the Lichtensteins and frequently taking dinner at their home. Mrs. Anita always met Joseph on those occasions, and so came to treat and regard him with that degree of consideration, consistent with propriety, with which a wife would naturally receive and treat one for and in whom her husband had displayed great personal esteem and confidence.

At the end of their three years' residence in Salt Lake, the Lichtensteins removed to Seattle, where they located and again engaged in carrying on the jewelry business, remaining in said city for about two years, and during that time Joseph visited Seattle and called on the defendant, Nat., at his place of business, where Mrs. Lichtenstein again met him. Finally, Lichtenstein and his wife moved to the city of San Francisco. Here they again met Joseph, who now lived, with his wife and young daughter, Natalie (named after her husband, so Mrs. Lichtenstein stated that Nat. had declared to her) at Des Moines, Iowa.

On the twenty-sixth day of December, 1911, Joseph, who was then in San Francisco, was the guest at dinner of Mrs. Lichtenstein, the mother of Nat. After they had partaken

of their dinner on that day, Nat. and his wife went to the home of his mother to meet and visit with Nat's sister, who was a resident of New York, and who was then sojourning in San Francisco and visiting her relatives and friends. They spent the evening with Nat's mother and sisters, Joseph also being a member of the party. Nat's sister from New York was stopping at the St. Francis Hotel, and the complaining witness, in the presence of Joseph, said to her (Nat's sister) that she intended to call on her at the hotel early on the following afternoon. It appears that Joseph was also a guest at the St. Francis.

At about half past two o'clock P. M. on the day succeeding that upon which the visit by Nat. and his wife was made at the home of Nat's mother, as above stated, Mrs. Anita Lichtenstein called at the St. Francis Hotel and in the lobby thereof met Joseph. The latter greeted her cordially and invited her to accompany him into the tapestry room of the hotel, and, accepting the invitation, she entered said room with Joseph and there chatted with him for a few moments. In this conversation, Joseph regaled her with a description of his beautiful home and home life in Des Moines, told her of his wife and little girl, of how pleasantly and happily he was situated, and assured her that if she would "only come and visit in Des Moines he would give her one grand time, that money was no object to him." In the tapestry room there was then a case in which Shreve & Co., a firm engaged in the jewelry business in San Francisco, displayed various specimens of jewelry, and as Mrs. Lichtenstein was in the act of leaving the room, she stepped up and looked in the case. She was attracted by a gold bag or lady's purse in the case and remarked to Joseph that she would like to have such a purse and that her husband intended to buy one just like it for her. She then proceeded to the room of her sister-in-law. That evening, she, with her husband, his two brothers and sister and the defendant, Joseph, had supper together at a restaurant, remaining there until about 11 o'clock, when the party separated. Before the company parted, however, Mrs. Anita promised her sisters-in-law that she would "be down" the next day and take them to lunch. On the following day—December 28th—at about the hour of 10:30 A. M., Joseph called the complaining witness on the telephone at her home,

and said to her that he had purchased for her a gold bag like
the one which she had seen and admired at the St Francis
Hotel the day before, and asked her what initial she desired
inscribed upon it.     She replied that she intended "coming
down town to take the girls to lunch and we will talk it over."
He requested her to call at the St Francis Hotel and she
agreed to do so in "about three-quarters of an hour."     Ac-
cordingly, she made her appearance at the hotel at a little
after 11 o'clock in the forenoon and met Joseph, who was then
standing on the outside of the hotel.     On his suggestion, they
immediately repaired to the tapestry room of the hotel, on
reaching which he exhibited to her a card on which these words
were written: "Mr. Joseph paid Shreve & Company $100.00
on a $450 bag, balance to be paid on bag when delivered."
What took place thereafter between Mrs. Lichtenstein and
Joseph may as well be told in the language of the former as
she told the story upon the witness stand: "I said, 'Why, Bert,
why did you spend all that money?'     And he said, 'Why not?
You know what I think of you and your family.     There is
plenty more money from where that came from,' and he
showed me a $9,000.00 check.     He held it under my nose and
said, 'Look at the check again.'     He said, 'Your pin and rings
are dirty.     Leave them at Shreve's and have them cleaned,
and I will pay for them.'     I said, 'I don't like to leave them
to be cleaned now.     I am going to have the girls to dinner.'
He said, 'Leave them to-morrow, and I will call for them.'
I then left Mr. Joseph and went and telephoned up to Mrs.
Lichtenstein, and I said, 'Hello,' and she said, 'Who is this?
I said, 'This is Anita.'     I said, 'Are you girls ready?'     And
she said, 'I thought you were not coming and we accepted
Mrs. Harris's invitation.     She has rung up so often.'     And
I said, 'Very well, dearie, I will come tomorrow.' . . . I said
to him (Joseph) : 'What an insult for any one to do anything
like that.'     And he said, 'Don't feel bad about that.     I will
take you to lunch. . . . Let us go to the Bay State for lunch,'
and I told him, 'No, I will go to the Golden Pheasant,' and
he said, 'No, let's go to the Bay State, but first I want you to
go and see the bag, and leave your diamonds to be cleaned.
I can't go with you into Shreve's because I have an important
business appointment, but I will walk with you as far as
Shreve's—I can't go in because I have an important engage-

ment,' and he said, 'Excuse me a minute,' and he went to telephone. He telephoned while we were at the St Francis Hotel, and he walked with me down to Grant Avenue, and said, 'Don't forget about the Bay State at 12:40. Leave your diamonds to be cleaned, and ask Mr. Hagedorn to show you the bag.' I went to Shreve's and asked for Mr. Hagedorn, who took the bag out with Mr. Joseph's card in it.'' It appears that Mrs. Lichtenstein was not pleased with the bag selected by Joseph, and asked to be shown some others, from which she selected one which suited her fancy much better. The price of the bag selected by her was $375.00, or $75.00 less than the one for which Joseph had bargained. She then left five diamond rings at Shreve's to be cleaned and started for the Bay State Hotel, reaching there at about the hour of 12:30. She testified: ''As I entered, the waiter said to me, 'You are expecting a gentleman?' and I said, 'Yes.' 'Step right into this booth. The gentleman just phoned and said he would be a little late,' and gave me a paper to read. . . . I sat and read the paper ten or fifteen minutes, and then Mr. Joseph came, and I said, 'Why so late?' And he said, 'I had an important appointment, and I could not get here sooner,' and I said, 'I have such a headache, Bert, what shall I do for it?' and he said, 'We will get a seltzer,' and he called a waiter and ordered a seltzer, who brought it and I drank it. Then he said, 'I have to go out for a moment.' He was gone four or five minutes.'' After his return to the booth, both he and Mrs. Lichtenstein partook of a light lunch, and during that time she told Joseph of having selected another bag than the one picked out by him, and asked him if it would be satisfactory to him if she accepted the one she had selected. ''He said to me, 'Why, Anita, I want you to satisfy yourself.' He then said that he met my husband in the middle of the block, and I said, 'Why didn't you bring him along?' and he said, 'Well, I wanted to surprise him with the bag.' Mr. Joseph then went to the telephone and telephoned Shreve's for the bag. Then he came back and said, 'Just step up stairs into the parlor. It is so stuffy here.' . . . He asked me if I would not step up stairs and wait for the bag, and then the waiter came up and spoke to him, and then another waiter showed me up to the room. We went into a hall and then to the back of the house and then into the parlor, and I said, 'Now,

Bert, what is this?' and he said, 'The parlor is taken. Take your coat off and make yourself at home.' I went up stairs to wait for the bag to come from Shreve & Company—to wait in the parlor. I took off my coat, and Mr. Joseph helped me take it off, and then the waiter knocked at the door. The door was unlocked. . . . The waiter said, 'Did you ring?' and Mr. Joseph said, 'No, I did not.' And then he said to me, 'Take your hat off and make yourself at home,' and he pulled the pins out of my hat and took off my hat.'' At about this time a loud noise or conversation occurred in the hall near the room or suite occupied by Joseph and Mrs. Lichtenstein, and the former said to the latter, both being in the ''parlor'' section of the suite, ''You'd better go into the other room—there's going to be some shooting.'' Acting upon this admonition, Mrs. Lichtenstein hastened to the bed-room, and at about the same time the door to the room was opened and several persons rushed into the front room of the suite. These persons were the defendants, Nat. and Sam. Lichtenstein and Nathan and a clerk in the latter's law office, named Paulist. Nathan, according to Mrs. Lichtenstein, immediately rushed up to her and ''pulled my bracelet off my arm, and my husband came in and said, 'I always thought that this was you, Joseph,' and I said, 'Just a moment, Nate, I'll explain.' He said, 'Don't call me Nate. My name is Mr. Lichtenstein to you.' '' After the departure of the Lichtenstein brothers and Nathan, Joseph put on his hat and, addressing Mrs. Lichtenstein, said, ''I will go down and try to fix it up with Nate, and you go out alone.''

Mrs. Lichtenstein further testified that no act of adultery was committed by her with Joseph on the occasion referred to nor at any other time, and that Mr. Joseph had never undertaken any liberties with her; that, on the contrary, since her acquaintanceship with him, his behavior toward her had uniformly been of the most decorous character, that he never, either directly or by insinuation, had made any improper proposals to her. While she was in the room, she declared, she removed from her body none of her garments, except her cloak and hat, as above described.

After leaving the restaurant, Mrs. Lichtenstein went to the establishment of Shreve & Co. and requested that her jewels be returned to her, saying, in explanation, that she would not

have time to have them cleaned, whereupon she was informed
(this testimony going in without objection) that her husband
had called at the store and demanded and received the jewels
but a few minutes previously to the time at which she ap-
peared and asked for them.    In this connection, Mrs. Lichten-
stein testified that no other person but Joseph had been told
by her that she left her diamond rings at Shreve & Company's
for any purpose.

Later in the day on which the episode above described oc-
curred, Mr. Nathan, so Mrs. Anita Lichtenstein testified, called
upon her at her apartments, and, introducing his conversa-
tion with the observation, "Mrs. Lichtenstein, my message is
short and sweet—under the circumstances your husband
wishes to get a divorce"—declared that he was willing to
institute the action upon the ground of cruelty or any other
charge she preferred to be made, provided she would agree
not to contest it, otherwise he would proceed against her on
the ground of adultery.    After a brief conversation, in which
Mrs. Lichtenstein expressed regret over losing her bracelet,
and to which Nathan replied that he had the ornament in his
possession, the latter departed, and two days thereafter—
December 30, 1911—Nathan, as the attorney of Nat. Lichten-
stein, and for the latter, filed a complaint in an action for a
divorce against Anita Lichtenstein, in the superior court in
the city and county of San Francisco, the ground therein set
forth being the alleged adultery by said Anita with one "B.
Joseph, at room 309 in the Bay State Hotel, number 275
O'Farrell Street, San Francisco," on the twenty-eighth day
of December, 1911.

From the testimony of the witness, Wilkie, a waiter on the
first floor of the Bay State Hotel, these facts are gleaned:
That, after arriving at the hotel and being shown into the
booth where Mrs. Lichtenstein, by pre-arrangement, was wait-
ing for him, and the two had finished their lunch, Joseph,
leaving Mrs. Lichtenstein in the booth, came to him (the
witness) and asked him to arrange for a suite of rooms for
him (Joseph) up stairs.    The latter desired to learn the
number of the room or suite to which he would be assigned.
Wilkie communicated the order for the suite to Martin
Mathiassen, the waiter having charge of the upper stories and
the rooms therein, and was told by the latter to send Joseph

to room 209. This information was by Wilkie given to Joseph. The latter thereupon went to the telephone, called up some party and held a conversation to which Wilkie did not listen and with the purport of which he was, therefore, not familiar. After concluding his conversation over the 'phone, Joseph stepped up to Wilkie and said: "If three or four gentlemen come, send them up to the room." Wilkie's hours of service for the day in the hotel expired at about that time and before the "three or four gentlemen came," but, just prior to the time that Joseph and Mrs. Lichtenstein reached the second story, he informed the "up stairs" waiter that several other persons were expected to visit the suite assigned to Joseph.

The testimony of Martin Mathiassen, the "up stairs" waiter, is in substance as follows: That when Joseph and Mrs. Lichtenstein, by way of the elevator, reached the floor on which suite 209 was located, he asked the former "if they were the party who reserved a room, 209," and he "just nodded." He then conducted them to room 208, "because I understood when the room was reserved there were to be more than two people." Room 209 is situated directly opposite room 208. Joseph and Mrs. Lichtenstein entered room 208, and approximately five or six minutes after that circumstance, the defendants, Nat. and Sam Lichtenstein and Nathan, made their appearance at the second floor and immediately went to room 209. Mathiassen asked them if they desired a room and one of them replied that they came there "to talk a little." At about this time the door of room 208 was opened, when the defendants just named rushed in, and one of them exclaimed, "And you a married man, too!" Mathiassen continued: "They rushed in as if they were wrestling, but no blows were struck. It appeared to me to be a sham." Shortly thereafter the defendants, the Lichtensteins and Nathan, left the hotel and were soon followed by Joseph. A little later Mrs. Lichtenstein departed from the hotel.

It appears that Joseph had arranged an important business engagement for the twenty-eight day of December with the Rosenblatt Co., at the office of the latter. This engagement he failed to keep, but appeared at the company's office on the following day—the twenty-ninth of December. Arthur S. Rosenblatt, a member of said company, testified that, on the

last mentioned day, Joseph said to him, in explanation of the reason of his failure to meet the engagement of the day before, that "he was doing some detective work for a friend of his whose wife they were trying to entrap." This witness further stated that a nine thousand dollar check in the possession of Joseph was, on the twenty-ninth of December, turned over by the latter to him in payment of a debt due the company.

Milton W. Rosenblatt, vice-president of the Rosenblatt Company, corroborated Arthur S. Rosenblatt's testimony of the admission by Joseph that the day previously (the 28th of December) he had been engaged in detective work and for that purpose had "followed a friend's wife."

Ernest A. Hagedorn, connected as an employee with the firm of Shreve & Co., waited on Joseph at the store of that firm on the morning of December 28th. He said that he showed Joseph the gold bags on that occasion and that the latter requested Hagedorn to reserve a certain one for him. The witness declared that Joseph paid nothing on the bag so reserved, nor did he receive a telephonic communication to deliver the bag at the Bay State Hotel. He also corroborated Mrs. Lichtenstein in the statement that, later on the same day, she called at the store, inspected the bag reserved by Joseph and then selected another bag, and that she left a number of pieces of jewelry at the store to be cleaned.

The witness Koch, also connected with Shreve & Co., testified to the fact of the delivery of the jewelry of Mrs. Lichtenstein by Shreve & Co. to her husband, and that, having been given notice by Mrs. Lichtenstein's attorney to return the jewelry to her, on the twenty-ninth day of December, called on Nat. Lichtenstein and, in the presence of his attorney, the defendant, Nathan, demanded the redelivery of the jewelry to the firm, which demand, after some discussion, was acceded to.

The people further showed that Mrs. Lichtenstein never received a gold bag from Shreve & Co. or from Joseph. It was also made to appear that, on the twenty-eighth day of December, 1911, and for a short time prior thereto, Joseph was a client of the defendant, Nathan, the latter having transacted some legal business for him in connection with the formation of a corporation.

The foregoing embraces, in substance, a rather extended statement of the testimony produced by the people in support of the charge alleged in the indictment.

In opposition to the showing thus made by the people, the defendants (with the exception of Joseph who was not a witness) each took the witness stand and denied that there was any previously arranged agreement between them and Joseph, whereby the latter was to lure Nat's wife into a restaurant or hotel or into a room containing a bed, with the understanding that they should, upon the consummation of the scheme, come into the room and apprehend her in a compromising position with Joseph. Nathan explained that, a day or two prior to the twenty-eighth day of December, Sam and Harry Lichtenstein appeared at his office and told him of rumors seriously reflecting upon the character of Nat's wife; that the rumors referred to were of such a character as to justly generate in the minds of Sam and Harry a strong suspicion that she was sustaining meretricious relations with some man or men; that they then retained the witness to inaugurate and prosecute an investigation of the rumors and thus ascertain whether they were or were not well founded; that he was about to set such an investigation in motion when, on the twenty-eighth day of December, 1911, he happened to have gone to the Alcazar Theater, situated directly opposite the Bay State Hotel, for the purpose of viewing the structure, it having recently been completed and never before seen by him, and at that time he saw Mrs. Lichtenstein enter the Bay State Hotel, followed a few moments thereafter by Joseph; that he immediately returned to his office, informed Sam Lichtenstein of the circumstance by telephone and requested him to induce Nat., without apprising him of the occasion thereof, to accompany him (Sam) to O'Farrell and Market streets, where he (the witness) would meet them; that the witness and his clerk, said Paulist, met Sam and Nat. at the point designated, and that from there they repaired to the Bay State Hotel; that Nathan entered the hotel, leaving the remainder of the party on the sidewalk, and in a very brief period thereafter returned, motioned to the others and all then entered the hotel together; that at about this time Sam explained to Nat. the purpose of the visit to the hotel and that, up to that time, Nat. was perfectly "in the dark" as to the object of their

presence there; that they went directly to the second floor and to room 209, Nathan having previously been informed by one of the attaches of the hotel that a man and woman answering the description of Joseph and Mrs. Lichtenstein had a short time before gone to the second story; that they remained in room 209 for a short time, when they heard voices in room 208, and that thereupon one of the party tried the door leading to that room, found it unlocked and opened it; that they saw Joseph in the room and that he and Nat. at once engaged in a fight, during the progress of which Mrs. Lichtenstein emerged from the bath room and ran to where Nat and Joseph were scuffling on the floor, and, addressing her husband, exclaimed, "Don't hurt him, Nate. My God, this is the first time this has happened"; that they (Nathan, Sam Lichtenstein and Paulist) "pulled Nate out and left the room." Nathan, the Lichtensteins and Paulist each testified that Mrs. Lichtenstein, when they entered the room, was partly undressed, her "hat, top skirt and waist" having been removed from her body.

The Lichtensteins and Paulist corroborated the testimony of Nathan in every material particular, and it is not, therefore, necessary to refer further to their testimony, except to say that Nat. Lichtenstein explained that his wife had previously told him of her intention to leave her jewelry with Shreve & Co. to be cleaned, and that when he was returning to his office from the Bay State Hotel, and within a block of Shreve's store, he remarked to Nathan: "My wife has got all her jewelry being cleaned. She told me to call for them. What will I do in that case?" Nathan replied: "I do not see any reason why you should not call for them," whereupon, as before related, he called at Shreve's and procured the jewelry.

Thus we have given a synopsis of the testimony constituting the defense interposed by the accused.

Upon the record evidence as it is herein presented, can a court of appeal coincide with the view, vigorously pressed upon us by the defendants, that the verdict is not sufficiently supported? The answer to the question thus propounded is to be found in a consideration of the evidence presented by the people in view of the familiar rule, established by our constitution, limiting the power of appellate courts, in the con-

sideration and decision of criminal cases, to the review of questions of law alone. By virtue of that rule, questions of fact in such cases cannot be so reviewed unless they have developed a character which converts them into questions of law. (Const., art. VI, sec. 4.) It, therefore, essentially follows, as has often been declared in the cases, that it is only where there is a clear failure of proof, or, perhaps, where the evidence is so slight as not to amount to satisfactory proof within the meaning of section 1835 of the Code of Civil Procedure, and the appellate court is legally justified in so declaring, or where the testimony from which the verdict must, if at all, derive its support, is inherently improbable, that the propriety of conviction on the evidence before the jury becomes a question of law within the competence of the court. (*People* v. *Kucher,* 120 Cal. 566, 569, [52 Pac. 1002] ; *People* v. *Williams,* 133 Cal. 165, [65 Pac. 323] ; *People* v. *Smallman,* 55 Cal. 185.) And even if it be true, as appears to be the position of some members of the legal profession, that one of the objects of the amendment recently added to our constitution (sec. 4½, art. 6) was to confer upon the appellate courts the power of reviewing and deciding questions of fact in criminal cases—a proposition which it is not necessary to decide here—this court, in exercising such power, would still be in no better position to say that the verdict was not justified or is not sufficiently supported, since, as we have shown by an elaborate examination of the proofs, there is evidence in the record pointing to guilt which cannot be justly characterized either as inherently improbable or "so slight as not to amount to satisfactory proof within the meaning of section 1835 of the Code of Civil Procedure." In such a state of the record, whatever may be the true design and scope of the section of the constitution referred to, it is obvious that to declare that the conclusion of the jury upon the probative force or evidentiary value of the testimony, is erroneous, this court would be compelled to substitute, arbitrarily, its judgment for that of the jury upon questions which, in the very nature of things, appellate courts are not in a position to determine.

The testimony brought before the jury by the people obviously suggested to the minds of the jurors the following significant questions, of which an explanation, *satisfactory to*

*the jury,* was required : 1. Why did Joseph tell Mrs. Lichtenstein that he had made a payment on the gold bag which he proposed to present her or exhibit to her a card purporting to be a memorandum of a payment on said bag, when as a matter of fact, he had made no payment thereon whatsoever? 2. Why did Joseph insist upon Mrs. Lichtenstein leaving her jewelry with Shreve & Co. to be cleaned? 3. How did it happen that Nathan, Nat. Lichtenstein's attorney, was in the vicinity of the Bay State Hotel when Mrs. Lichtenstein and Joseph entered therein? 4. Why did Joseph, immediately upon learning the number of the suite of rooms to which he and Mrs. Lichtenstein were to be assigned, communicate with some one over the telephone? 5. Why did he then inform the waiter, Wilkie, that he expected "three or four gentlemen" would shortly call on him at the hotel and request that they be directed to room 209? 6. How did it happen that the defendants, Nat. and Sam Lichtenstein and Nathan, went to the hotel together at that particular time? 7. How did it happen that the defendants, upon entering the hotel, immediately went to the second floor and to room 209? 8. Why did the defendant, Nathan, the moment he reached the interior of the room occupied by Joseph and Mrs. Lichtenstein, rush up to the latter and violently remove a bracelet from her wrist and retain the jewel? 9. How did Nat. Lichtenstein learn that his wife had left her jewelry with Shreve & Co.? 10. What did Joseph mean to imply when, on the twenty-ninth day of December, 1911, he declared to the Rosenblatts that, on the preceding day, he had been engaged in doing some detective work by attempting to entrap a friend's wife? The testimony thus interrogatively referred to, it must in all fairness be conceded, seems to be of the most incriminatory character as applied to the charge set forth in the indictment, and, as before stated, the circumstances thus developed called for an explanation the effect of which would have been, *in the estimation or judgment of the jury,* to destroy their inculpatory force.

As has been shown, the defendants essayed an explanation— that is to say, they made a futile attempt to overcome the effect upon the jury of the testimony presented by the people in support of the indictment. It may justly be conceded that the theory of the defense and the testimony offered in its

support appear to be reasonable. At the same time it must also be conceded that the testimony produced by the people in support of the charge is, upon its face, equally reasonable. There is nothing in the latter testimony which brings it within the realms of the miraculous, and it cannot, therefore be held to be inherently unbelievable. Nor are we at liberty to say, justly, that, as brought to the attention of the jury, it was not sufficient to produce moral certainty of the truth of the charge in an unprejudiced mind, which was, presumptively, the condition of the minds of the jurors when they were considering and finally reached a conclusion upon the facts. In short, we cannot hold that the verdict is without sufficient support in the evidence unless we are prepared to declare, either that the jury should have disbelieved or repudiated, *in toto,* the testimony presented by the people and have accepted as verity that produced by the defendants, or that the conflict which appears to have arisen in the evidence is sufficient to have created in the minds of the jurors, as reasonable and unbiased men, a reasonable doubt of the guilt of the accused. Obviously, such a declaration by this court would involve a palpable usurpation of the prerogative of the jury.

2. The next assignment involves criticism of the rulings of the court permitting Arthur S. and Milton W. Rosenblatt to testify to statements made by the defendant, Joseph, on the day following that of the episode in the Bay State Hotel, that he had been engaged, on that day, in a scheme to entrap the wife of a friend. The significance of that testimony in the proof of the charge laid in the indictment is obvious, and if for any reason it was incompetent or not legally entitled to be admitted into the record, then the error in allowing it is certainly prejudicial in the highest degree. But it is conceived that an examination of the objection will disclose that it is devoid of merit.

As has been shown, the gravamen of the charge in the indictment is that the defendants conspired together for the purpose of facilitating, falsely or without cause, the commencement and maintenance of an action for divorce by Nat. Lichtenstein against his wife. The entrapping of the wife of Nat. into a compromising position with Joseph for the purpose of securing evidence by which such action might be

supported was merely an intermediate instrumentality through which the ultimate end or object of the conspiracy was designed to be achieved. In other words, according to the allegations of the indictment, the ultimate object of the conspiracy was the institution and prosecution of a suit for divorce, and the scheme to inveigle Mrs. Lichtenstein into the hotel under the circumstances and with the result as above indicated merely constituted the *means* whereby that ultimate object was to be accomplished—that is to say, it was a part of the unlawful agreement whose final object was the commencement and maintenance of a suit for divorce without cause. (*People* v. *Richards,* 67 Cal. 412, 422, [56 Am. Rep. 716, 7 Pac. 828]; *People* v. *Daniels,* 105 Cal. 262, [38 Pac. 720].) In this view, the testimony of the extrajudicial admissions of Joseph relating to the conspiracy, having been made prior to the time at which the action for divorce was commenced, constituted competent proof against all the defendants. (Code Civ. Proc., sec. 1870, subd. 6.) But, assuming, as the trial court seems to have assumed, that the object of the conspiracy was to corruptly *secure evidence* upon which to predicate an action for divorce upon the ground of adultery and that it was fully attained and the conspiracy completed upon the conclusion of the episode at the Bay State Hotel, there is still an effectual reply to the objection urged against the propriety of the testimony under present review in the fact that the trial court, on overruling the objection to the testimony, emphatically and explicitly admonished the jury that they were to consider the alleged admissions of Joseph only in so far as they might affect him, and that they could not operate to bind the other defendants or in any manner or degree be considered by the jury as affecting them. This statement or one to the same effect was made by the court, when ruling on the objections to the evidence, on two different occasions, and we must presume that the jury took heed of it and considered the testimony accordingly. It is true, as counsel declare, that the court, in its final charge to the jury, did not limit the purpose for which the evidence might at the least properly be considered, but even if this were necessary or required after the court had explained that it could be considered for a limited purpose only, the defendants are in no position to complain of the error attending the

omission thus to limit the use of the testimony, since it does not appear from the record that they requested the court to submit to the jury any such instruction. It has been repeatedly held that where testimony is properly received for a specific or limited purpose and it is important that its consideration in reaching a conclusion upon the facts should be restricted to that purpose, it is the duty of counsel representing the side against which such testimony may be supposed to militate to ask for an instruction limiting the effect thereof to the particular purpose for which it was admitted. (*People* v. *McCrae,* 32 Cal. 98; *People* v. *Collins,* 48 Cal. 277; *People* v. *Estrado,* 49 Cal. 171; *People* v. *Ah Yute,* 53 Cal. 613, 615; *People* v. *Haydon,* 18 Cal. App. 543, 570, [123 Pac. 1102].)

3. During the trial of the cause and after the people had finished the presentation of their original case, Judge Cabaniss, before whom the trial was begun, was taken ill and was by reason thereof unable to proceed with the trial. It was thereupon stipulated in writing between the district attorney and the attorneys for the defendants that ''Hon. B. V. Sargent, a judge of the superior court of the state of California, may sit as judge in the above cause, and try the same with the same force and effect as if the Honorable George H. Cabaniss, a judge of the above court, were present and acting himself, and all objections to the Honorable B. V. Sargent acting as judge of the above trial in all further proceedings therein are hereby expressly waived.''

The substitution of judges in criminal cases is authorized by section 1053 of the Penal Code, added to said code by the legislature of 1911. (Stats. 1911, p. 365.) That section reads: ''If after the commencement of the trial of a criminal action or proceeding the judge shall die, become ill, or for any other reason be unable to proceed with the trial, any other judge of the superior court in and for the county, or city and county, in which the case is pending may proceed with and finish the trial; or, if there be no other judge of such superior court, then the clerk or sheriff shall adjourn the court and continue the case from day to day, until such time as the governor shall designate a judge of the superior court from some other county to proceed with and complete the trial, or until such time as, by stipulation in writing between the district attorney and the attorney for the defendant, filed

22 Cal. App.—39

with the clerk, a judge shall be agreed upon by them to complete said trial. The judge authorized by the provisions of this section to proceed with and complete the trial shall have the same power, authority and jurisdiction as if the trial had been commenced before such judge.''

The contention now is that, notwithstanding the stipulation above referred to, the substitution of Judge Sargent for Judge Cabaniss under the circumstances above pointed out constituted error seriously prejudicing the substantial rights of the accused. The argument is that the provisions of the statute authorizing the change of judges during the progress of the trial of a criminal action are mandatory and must be strictly followed; that in those counties where there are two or more judges of the superior court, and in such counties a judge engaged in the trial of a criminal case or proceeding shall, after the commencement of such trial, ''die, or become ill, or for any other reason be unable to proceed with the trial,'' it is the duty of another judge of said court to proceed with the trial of the action, and that in such case a stipulation by the attorneys for the defendant that a judge of another county may be called in to complete the trial is void or of no force. This position is grounded on the theory that, the statute being mandatory in its terms, the defendant cannot waive nor be held to waive the right to have the cause proceeded with by another judge of the court in which the action is pending. We are of the opinion, however, that the language of the statute in the respect referred to is merely directory. The language is that any other judge of the superior court of the county in which the case is pending *may* proceed with and finish the trial, not that he *must* do so, and, while the word ''may'' is often interpreted to mean ''must,'' as used in certain statutes, in this case no reason for so interpreting its meaning as used in the statute under consideration is apparent. On the contrary, there are substantial reasons for holding that it was not intended to be so construed. It might happen, in counties where there are but two judges, that the judge not engaged in the trial of the criminal action, at the time the necessity for a change of judge in said action arises, is himself engaged in the trial of an action in his department of the court, and that the trial thereof might consume a long period of time. Under the construction which counsel for the

defendants put upon the statute in question, it would be requisite to postpone the further trial of the criminal action until the other judge had finished the trial of the case before him. And then suppose the other judge happened to be ill at the time that the necessity for the change in the criminal case arose, would it be contended that the trial of the case could not be resumed until such judge or the judge who commenced the trial of the action (assuming that he had not died) had recovered his health or was again able to discharge his judicial duties? Or, suppose the other judge of the court was legally disqualified from trying the cause, and the judge who commenced the trial was afflicted with a malady which involved protracted physical disability and consequent inability to resume the trial for an indefinite period? The legislature certainly did not intend that any such situation should be possible.

There is no question here, as in the *People* v. *Powell,* 87 Cal. 348, [11 L. R. A. 75, 25 Pac. 481], referred to by counsel for the defendants, of an attempt to waive any right to which a defendant in a criminal case is entitled and without the actual exercise of which, whether it can be said to result in actual harm to him or not, he cannot receive the trial guaranteed to him by the constitution and the statutes governing such trials. The calling in of a judge from one county to preside over a criminal trial in another is of frequent occurrence and is not an act which is, *per se,* injurious to the defendant.

The statute in question plainly authorizes a judge from another county to be substituted for the judge who commenced the trial of the action upon the happening of any of the contingencies which may, under the statute, give rise to the necessity for a change of judges during the progress of the trial. The necessity for the substitution being made to appear, it is certainly immaterial under what circumstances such judge was called in, so long as the judge was agreeable to all the parties to the action and their acquiescence in the change is evidenced as required. The substantial rights of the defendant could in no way be impaired by such change. Besides, the statute expressly provides that, when a change of judges becomes necessary, the attorneys for the respective parties may agree upon a judge and stipulate that he may proceed with and

complete the trial of the action.    Thus it apears that, in calling in Judge Sargent, a judge of another county than the one in which the action was pending, by agreement of the attorneys of the respective parties, which agreement was evidenced by a stipulation in writing, nothing was done which was not expressly authorized by the statute.

As before declared, we are firmly of the belief that the language of the statute which appears to make it necessary, where a superior court has more than one judge, that a judge of that court shall proceed with and complete the trial under the circumstances contemplated by the statute, cannot in sound reason be held to have been intended as mandatory.

But, as illustrative of the disadvantage to which the defendants were subjected by the change of judges, counsel point out that Judge Sargent, not having heard the testimony of the witnesses introduced to support the original case of the prosecution, was not in a position to properly consider and justly dispose of the motion for a new trial, one of the grounds of which was the insufficiency of the evidence to justify the verdict.    No less could be said of a judge of the same court called in to finish the trial of the case under the same circumstances. It is, of course, true, however, that, in the trial of all cases, the judge, while having no legal right to trespass upon the legitimate province of the jury, nevertheless exercises a supervisory power over their actions, and may set aside their conclusions in a case where he is convinced that their verdict is not justified.    To do this, he must have an opportunity equal with that of the jury of observing and considering all the elements or tests which constitute the criterion whereby the evidentiary value of testimony is determined and which are, of course, alone available to him who sees the witnesses as they give their testimony.    It is, therefore, obvious that where, after the commencement of a criminal trial and much, if not all, the important testimony for the people has been taken, there is a change of judges and the testimony already taken is not repeated before the judge thus called in, the defendant, having been convicted, would be at a great disadvantage in presenting a motion for a new trial upon the ground of the insufficiency of the evidence to justify the verdict, and if such a situation were, by the law, forced upon a defendant in a criminal case who had been convicted by a jury,

there would be no little merit in the argument that the accused
had thus been deprived of a substantial right—the right, guar-
anteed at least by the statute, if not by the constitution, to
secure the judgment of the judge trying the case upon the
question whether the conclusion of the jury, as represented by
a verdict of conviction, is or is not legally justified. In the
case at bar, however, there is presented no such situation.
The defendants themselves, as we think, were clearly within
their election, assuming it to be true that it was within their
right to have required the testimony already received to be
reproduced before the court and jury after the change, ex-
pressly stipulated that Judge Sargent might assume control
of the case "with the same force and effect as if the said
Hon. George H. Cabaniss . . . were present and acting him-
self," expressly waived "all objections to the Hon. B. V.
Sargent acting as judge of the above trial in all future pro-
ceedings therein," and after Judge Sargent took charge of
the case, made no motion or application for the taking *de
novo* of the testimony already received, and, indeed, from
the wording -of the stipulation, it is clear that there was
neither an intention nor a desire on the part of the defend-
ants that said testimony should be gone over again. As
was said by the supreme court, in the very early case of the
*People* v. *Henderson,* 28 Cal. 466, 473, where a question sim-
ilar to the one under review was considered, so it with equal
propriety may be said here: "If the parties interested con-
sent to such a course of proceeding, we can see no objection
to it. The parties interested are in a condition to judge
whether the circumstances of the case are such that they are
liable to be affected unfavorably by the change. After delib-
erately consenting to such change, and taking the chances of
a successful issue and losing, they cannot be permitted to re-
pudiate the proceedings and avail themselves of a more favor-
able result on a second trial."

It may be observed that Judge Sargent heard the testimony
of all the witnesses for the defendants and the rebuttal tes-
timony presented by the people. Moreover, as the record
shows, before passing on the motion for a new trial, he read
the testimony received before he assumed control of the case,
and altogether was as well equipped to make as judicious and

just a disposition of the motion as the circumstances, largely of the defendants' own creation, would admit of.

4. Since the submission of this cause, counsel for the defendants have filed a copy of the findings and the decree in the action instituted in the superior court of the city and county of San Francisco by Nat. Lichtenstein against his wife, Anita Feder Lichtenstein, for a divorce. The court in that case found that the allegations charging conspiracy between the defendants here to procure false testimony to be used against Anita at the trial of said divorce action were not sustained by the evidence, and were, therefore, untrue. Counsel, in a brief accompanying the copy of said findings and decree, undertake to maintain, upon the authority of the recent case of *Sewell v. Johnson,* 165 Cal. 762, [134 Pac. 704], that this court may, in passing upon the question of the sufficiency of the evidence to support the verdict, consider the findings of the superior court of San Francisco in the said action for a divorce, and further insist that, since the findings in the divorce action upon the question of conspiracy are directly opposed to the finding of the jury in this case, it is the duty of this court to declare that the verdict of the jury was not justified.

We do not construe the opinion in the case referred to as counsel seem to understand it, and confess that we would be much surprised if any such a rule were laid down in any case by any court. There are many obviously cogent reasons why such a rule is impossible. Among the first of these is that the evidence in the one case might be different from the evidence in the other—the evidence in the one might be stronger or weaker or more convincing or less convincing than in the other. Again, the judgment of one jury or that of a judge upon the same facts would amount to a mere conclusion or opinion of a set of individuals or of one individual from the evidence produced, and a conclusion or an opinion of that sort is never permissible in the proof of a disputed fact. It possesses no probative value. If the divorce action had been tried prior to the trial of the criminal conspiracy case, no one would be heard to say, we apprehend, that the result reached in the civil action or the findings educed from the proofs submitted therein would be competent evidence in the criminal case as tending to prove either the guilt or innocence of the accused. There would be no less reason for holding the verdict against

Nat. Lichtenstein to be competent evidence in the divorce action to prove the charge of conspiracy alleged in the pleadings of Anita Lichtenstein, the defendant and cross-complainant therein.

The case of *Sewell* v. *Johnson,* 165 Cal. 762, [134 Pac. 704], was this: The plaintiff obtained a judgment against one Price for the sum of $7,728. From that judgment an appeal was taken to the supreme court. While said appeal was pending, the defendant, Price, transferred to one Johnson one thousand four hundred shares of stock which he owned in a building association. The plaintiff, Sewell, while the appeal in said case was still pending and undisposed of, brought suit against Johnson, the transferee of said stock, to set aside the transfer, alleging in his complaint therein that the transfer was fraudulent and made for the purpose of defrauding the creditors of Price, and particularly for the purpose of defeating the judgment obtained by Sewell in the said case of Sewell *v.* Price. Sewell secured judgment against Johnson, decreeing that one thousand shares of the stock transferred to the latter by Price was in fraud of Price's creditors, etc. An appeal from said judgment was taken to the supreme court by Johnson. The supreme court, at the time the issues were framed in the case of Sewell *v.* Johnson and the action was tried, had not rendered a judgment in the case of Sewell *v.* Price, but later filed an opinion therein, reversing the judgment. It was, of course, impossible for the defendant, Johnson, in the later case, to plead the judgment of the supreme court rendered in the case of Sewell *v.* Price. A stay of execution was not obtained in the latter case, and there was, therefore, no reference made to said case in the pleading of the defendant in the Johnson case. It was, however, made to appear to the supreme court at the oral argument before that court of the Johnson case and by ''supplemental memoranda'' filed therein that the vitality of the judgment in said case depended solely upon the judgment in the other case. In other words, it was made known to the court, by means held to be competent, that the case of Sewell *v.* Johnson was based entirely on the judgment in the case of Sewell *v.* Price, and that, without the latter judgment, there was absolutely no foundation upon which the judgment in Sewell *v.* Johnson could be supported. The judgment in the Price case having been reversed and thus

rendered a nullity, manifestly, in the interest of justice, the judgment whose vitality solely depended upon it should likewise be rendered a nullity. And this was the conclusion forced upon the supreme court, and in order to reach a result so manifestly just under the circumstances, it held, in its majority opinion, that, it having obtained knowledge by evidence *de hors* the record on appeal in the Johnson case of the relationship of the two judgments, as above indicated, it was authorized to take notice of its judgment in the Price case and thereupon hold, as it did hold, that, because of the reversal of the judgment in the Price case, the judgment in the Johnson case could not, of course, be upheld. But, as declared, there is absolutely no language in the opinion which supports the contention of counsel that the findings of a court in a civil action may properly be considered either by a jury in the trial or by an appellate court in the review of a criminal case involving precisely the same issues and parties for the purpose of determining the question of the guilt or innocence of the accused or whether the verdict of guilty was justified. We have perhaps given more attention to the contention than it deserves, but counsel appear to be very earnest in the presentation of the proposition and we felt, therefore, that it was at least due them to give them the benefit of our views thereon.

After the most careful and painstaking examination of the points made by the defendants by the light of the voluminous record before us, we have not been able to reach a conclusion that the verdict should be disturbed.

The judgment and order are, therefore, affirmed.

Chipman, P. J., and Burnett, J., concurred.

A petition to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on October 17, 1913.